The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. There are four cases before the Court this morning, three of which are set for argument. The first argued case is Case No. 19-2024, Pyrotechnic Specialties v. Secretary of Defense. Mr. Cooper, I understand that you've reserved five minutes for rebuttal. Is that right? Yes, Your Honor. Okay. Are you prepared to begin? Yes, Your Honor. All right. You may. Good morning. May it please the Court, on behalf of Pyrotechnic Specialties, Inc., which I will refer to probably as PSI throughout this argument, we request that the Court reverse the decision of the Armed Services Board of Contracting Appeals because the judgment of the Board was not supported by the substantial evidence at trial. There are two aspects of the lack of substantial evidence to support the Board's ruling. First, the Board relied primarily on the testimony of one inspector, Mr. Bowen, who admitted in his testimony that he had a lack of personal knowledge about the production and testing of the signal flare at issue both at PSI and also, more importantly, at Martin Electronics, which was the vendor who produced the flare before PSI took over the contract. Mr. Bowen, specifically, he testified while being led by a government attorney that Martin Electronics had produced a million of these flares at a Class A designation, meaning they were fit for any purpose, for any use. But then when he was on cross-examination, he was unable to say, he could not recall ever witnessing any testing at Martin Electronics, he couldn't recall any details of Martin Electronics, and he couldn't say how many of those million flares were accepted on deviations. And as I'll talk about in a minute, that's a critical aspect of this case because the TDP, in this instance, is defective. Let me back up before we get to the TDP. Is it your position that if the government has ever accepted defective product in the past, it's somehow bound to accept defective product in the future? No, Your Honor, I'm not arguing that. The only reason I focus on what occurred at Martin Electronics is because it's critical to understand that the problem in manufacturing this product, which comes from the termination of the production of the 363L sealing disc by 3M, another vendor, they stopped making that sealing disc, and the problems that PSI experienced were also experienced by Martin Electronics. We don't say that the government is always bound to accept all of these flares on deviation, but what we do say is the fact that neither vendor could manufacture the flare is evidence that the TDP is defective. But wasn't PSI able to produce lots that were accepted without deviation while using the sealing disc? I believe, Your Honor, that almost all of the lots were accepted on deviation. There were Interfix 1.3, I see, was accepted without deviation. But once the 363L product by 3M was discontinued, and 3M said, well, you've got this 433 material, this paper, this double-sided adhesive you could use, and they said it has similar chemical characteristics and tensile strength, but it did not work in this application as well. And once PSI had to make that switch, then the problem occurs that the government's specifications no longer work in the same way, and that's why the government loses the benefit of their immunity from the production, or excuse me, from the design of this flare. It's the replacement of that sealing disc that leads, it's like a roll of dominoes. You hit the first one, and then all of these other problems of production occur. Those same problems occur at Martin Electronics, and that's what shows... Is it your position that there's just not enough evidence of what happened at Martin Electronics, or that there was evidence that all of those things occurred? Kind of both, Your Honor. First of all, there was evidence as to what happened at Martin Electronics. PSI, when they experienced these difficulties in production, hired an employee from Martin to come in and try to right the ship. And he had knowledge of the production of flares, and he testified at the trial. So there was some evidence as to what occurred at Martin. But more importantly, that is the sort of evidence that was excluded at trial as being irrelevant based on the government's objections, and we contend that it was relevant. And in fact, part of the problem... Isn't there a new disc after the start of this particular contract? There is. So there's two new discs, Your Honor. There's the 433 disc that's made using a 3M product that did not work. And then PSI actually took, when the production shut down for almost a year, they took that opportunity to design a steeling disc that they thought would work. But it's during that design process and testing that you see some of the abnormalities, like the flare, there's one side of it in all the briefs, where when testing one end, the other end blows off, you know, I don't know, 40 feet down the range or something, because there was too much pressure built up in the aluminum tube. And so PSI, yes, there was a new disc, but PSI actually had to design it. Part of the problem that occurs, though, is throughout this trial, the government objected as to any evidence of bad faith of the government inspectors or the contracting officer coming into evidence. Now, in their brief that they filed with this court, I think it's on page 40 of this brief, they now say, well, PSI urged the panel, the board here, to apply the wrong arbitrary and capricious standard. And the standard they now say should be used has four factors. The very first one is evidence of subjective bad faith on the part of the government official. So the government seems to now acknowledge in their briefs to this court that, in fact, evidence of bad faith was relevant and is important. But I've gone through those objections, and it appears to me that things weren't actually excluded, that you claim were excluded. I mean, the dialogue back and forth with respect to a lot of the objections seemed to show that things were admitted and were allowed. It was just a question of developing the theory properly. That is correct for some of the objections. You're right, Your Honor. And so, in many instances, as I recall, Judge Page, and, of course, PFI was a pro se litigant at the time, but I observed the trial, read the transcript, and my recollection is that Judge Page, in many instances, would say, I'm going to admit it for whatever probative value it may have. When I determine if we're going to allow this bad faith evidence in, you have to recall, the court must recall, that this trial occurs in October of 2014. It's not until December of 2016, January of 2017, that the court finally determines what issues were being tried. It's like watching a baseball game. But wasn't part of the problem that PSI did decide to go pro se? I mean, the problem was that there was a difficulty really determining exactly what the theory was, and there was a misunderstanding of basic evidentiary principles. And I got the feeling that the judge was actually trying to work with these pro se parties to try to make it easier on them to try to prove their case, not the other way around. I don't fault the court, Your Honor. And by the court, I mean the judge. I don't fault the board for how it treated PSI. I'm not trying to in any way impugn Judge Page or say that she treated PSI improperly. It is difficult dealing with pro se litigants. I understand that. I clerked for a trial judge. I get that. But the reality is that decisions were made that were difficult. PSI had a very consistent theory of this case throughout the trial, and that was from the outset, even in the pretrial conferences, that the government's bad faith was relevant and admissible and should come into evidence. What is your precise theory of bad faith? The precise theory, Your Honor, unfortunately there's no proper evidence in the record. But PSI had multiple contracts. They produced not only the signal flare, but they produced a flash bang grenade. And what you see is that the DCMA inspectors were responsible for the inspection of the flares and the flash bang grenades, and what you see is a concerted effort by these inspectors, especially Mike King, whose deposition testimony in which he acknowledges he perjured himself in grand jury testimony about PSI. These inspectors conspired against PSI. That's the theory, and that's what was excluded from evidence. But what the judge said is you have to lay a foundation, and, in fact, he allowed you to precisely ask if prior fraud was a factor in the consideration, and the answer was no, right? I think he allowed us to ask one witness that, but the critical thing is that that juncture, the deposition testimony of Mike King, should have been allowed into evidence in response to that testimony from the contracting officer, I believe, who was asked that question. And at that point, Mike King's testimony became directly relevant to the truthfulness of that testimony by the contracting officer, and it was ultimately excluded. That deposition, among other pieces of evidence, was that deposition especially, the exclusion of which is so harmful. And the government's only objection to the admission of the deposition was on relevance grounds. They now, in their brief statement, there were foundational issues. They did not raise that with the court at the time. So that's problematic. Was Mike King involved in this contract in any capacity? He was not an assigned inspector, but, yes, he was knowledgeable of the testing, and he was involved behind the scenes in how PSI was treated in this contract and in the efforts to have this contract terminated. And it's that involvement which really necessitates the conversion of the termination from default or for default to one of convenience, that and also the inability to manufacture the product now that 3M has discontinued the 363L sealing disk materials. Okay. Do you want to save the rest of your rebuttal? Yes, Your Honor. Okay. We'll hear from the government. I may plead the court. The board held a four-day hearing, made 185 fact findings and 66 pages, and a fair reading of the transcript of the four days of the hearing shows a judge who is bending over backwards to be as overly inclusive as possible, mindful of the fact that PSI was represented by party representatives and not represented by counsel. Judge Page repeatedly gave guidance as to how these party representatives could establish the foundations or the testimony they were trying to get in. And, ultimately, she sustained the termination for default and failed to deliver lots 4-2 and lots 4-3. The failure to deliver is not really disputed, and, therefore, the burden of proof shifted to PSI in order to excuse its default. The government concedes that the board deviated from its standard of review when evaluating PSI's arguments. Why isn't that a problem? In terms of the abuse of discretion analysis, we believe that the board did not apply the proper standard. There's a four-part test that this court has used in McDonnell Douglas, originating from the 1982 court of claims case, United States Fidelity and Guarantee. There's four factors. The board did not apply that. But based on the findings of the board itself, there's clearly a reasonable contractual related basis for the termination for default. Again, this is a challenge to a termination for default decision. So all of the incidences with the quality assistance representative, whose name was mentioned by counsel, it's notable that Judge Page does not mention this gentleman's name because there have been absolutely inflammatory, somewhat scandalous allegations of this man engaging in unethical and perhaps even criminal behavior without even bothering to call this gentleman. This gentleman, by the way, ceased having any contact or work on this contract, which was terminated after seven years. After a few months, he was gone from the contract. I think you're jumping around a little bit. On the standard of review, you admit that they used the wrong standard of review when they were supposed to use a de novo review. But it's your position that that was harmless? Is that right? Yes, exactly like in McDonnell-Douglas. I think it's very similar to McDonnell-Douglas. In fact, the board's analysis was similar to what caused the Court of Federal Claims in McDonnell-Douglas to get sideways in order to be sort of focusing on whether the contracting officer, in this case it was whether the Navy customer really wanted to terminate for default, whether there's a proper consideration of the FAR factors, and all of this kind of APA type analysis, had the board come out the other's way, would have been reversible error. But I think it's better than McDonnell-Douglas. Okay, what about the TDP? I mean, it does seem like everybody who tried to use the ceiling desk had problems with it. Yes, and the board made numerous findings that Martin did experience problems, but they managed to produce, and the evidence is not really disputed, a million of these units, and PSI was able to produce these units as well. But the issue is, after giving multiple extensions, multiple modifications, delivery schedule modifications, working with PSI, and there were very serious manufacturing problems that developed. For instance, although PSI and its reprises makes it seem like the agency was digging them for these trivial noncompliance issues. In fact, there was, during an earlier lot, there was a shutdown under the contract because the unit fell apart during the functional test, which obviously not only would have endangered the life or limb of the ultimate customer or user, but also they had to shut down testing because the testing was too dangerous for the actual testing officials. So these were serious manufacturing problems that persisted throughout. And one of the issues of dispute, well, I'll just get back to the board. My first finding was that PSI, granted they did not have counsel, but they never made... Ms. McCarthy, this is Judge Toronto. Can I just ask you to focus on the very specific thing that was the basis for the default was the failure of, what is it, 4-2 and 4-3, is that right? Yes. Okay. So tell me what one knows about the problems of manufacturing for those specific devices and in particular, and I'm talking about PSI here, but I'm also interested in whether Martin successfully produced those particular devices or whether Martin's million units involved pre-4-2 and 4-3 components. I don't think the record is clear on that. I can tell you, but the problems with the lot 4 and lot 4-2 and 4-3 were that they had some leakers and primarily it was long smoke time. Just correct me if I'm wrong. My understanding, and I may well be wrong, is that the theory of PSI is that putting aside problems that predated 4-2 and 4-3, the only reasonable inference from the record as to 4-2 and 4-3 is that the problem was the specifications demand for a particular, what is it, sealing disk or something like that, and as to that, which is the only thing that matters, there's only one possible basis for the defective results because manufacturing defects didn't apply to that and Martin didn't apply to that. Well, as the board found, there's no evidence in the record to show that there was any nexus between the allegedly defective sealing disk and the manufacturing problems that they had. In fact, the contracting officer who was new, Ryan Pearson, asked for a root cause analysis, which PSI mentions repeatedly in its briefing, but that was rejected at appendix page 1635 because the agency concluded that based upon the data submitted, the root cause in this instance is not conclusive. Just to be clear, was that specifically about the 4-2, 4-3? Yes, this is preceding lot 4-2, but this is the root cause analysis. I'm sorry, it's really, really important to me, and I could be confused, that if this root cause analysis matters, it has to be about the 4-2 and 4-3. Right, it preceded 4-2 and 4-3 because they were shut down. So the contracting officer wanted to resume the contract in early 2011 and specifically asked PSI for a root cause analysis, which it subsequently rejected on February 7, 2011 at 1635. Then they proceeded with lot 4, and on appendix page 2101, there's the quality assurance representative's report on September 2, 2011, and this is for lot 4-2, showing that even with the deviation, even though the smoke time was increased from 19 seconds to 25 seconds, still the range of the smoke temperatures were from 25 to 41 seconds. There's no evidence in the record, and the burden was on PSI to adduce this, that Martin had greater relaxation of smoke times. In fact, it doesn't make much sense because these are 5.5-inch units, and the idea of having a 41.48-second smoke time means that it could not be robust and continuous, which is what a stranded pilot needs while he's treading water in the water. So these are serious deviations. On appendix page 74, the board found that PSI had failed to present any detailed or credible analysis that the allegedly defective specifications were the cause of what the agency saw as a manufacturing problem. Can you clarify something for me? It's my understanding that the specification required disks that satisfied certain requirements but didn't require a particular disk. Is that right? Exactly. That's absolutely correct, Your Honor. That's absolutely correct. And PSI, when PSI went in, there's a lot of evidence in the record about how it engaged another subcontractor to come up with a different disk. The agency exceeded the PSI's desires to do that. It didn't instruct PSI to do that. The technical data package contains drawings, and the agency approved whether certain ceiling disks satisfied the drawings. But it was up to PSI to manufacture them, and they simply did not induce the evidence. Did PSI at some point get permission to use a thicker disk? Yes. Yes, it did. And then still had problems with use of the thicker disk? Right. And it blames the thicker disk. But, again, this is a situation in which the agency is exceeding the PSI's desire to use these different disks, so long as they conform with the drawings. But it continues to be the view of the agency that, on Genentech page 1635, that the test data as presented, and this is in February 2011, appears to show that it's more of a quality deficiency with the production line than with the ceiling disk issue. And Judge Page noted, after really bending over backwards, I think she was extremely indulgent of PSI during the four-day hearing, she ultimately concluded correctly that there was no detailed or credible analysis that would link the ceiling disk to the problems with meeting the specifications. And these were not trivial problems. These go to safety of life and limb and also just the functionality. If you have a long smoke time, then the product will not succeed and be successful in its intended use. Can you just recount what happened at the hearing with respect to the Martin evidence? What was requested by PSI? What were the government's objections? What was the testimony? What was the adjudicator's ruling? Well, one of the officials testified. It was the government's main witness was Kevin Bowen, and he had familiarity with Martin. But they didn't call anyone from Martin. It was a failure of proof on their part. There wasn't really a whole lot of evidence. Was evidence offered by PSI that was rejected by the adjudicator? Counsel can correct me, but I don't believe so. I read the entire four days of transcripts this weekend, and the overwhelming impression is that I think that particularly with regard to the allegations of fraud, the judge let a lot of speculation and innuendo and defamatory statements. I don't know if they're defamatory or not, but she let them on the record. And I think it's notable that in her decision, Judge Page does not identify this. She calls him the former lead QIR. She doesn't identify him by name, I think, to protect him because a lot of this evidence came into the record, which is quite damaging to this man's reputation, without a scintilla of evidence to prove it. Not a scintilla of evidence to prove it. And with regard to the excluded deposition, this is like any trial. Yes, deposition testimony can come in under certain circumstances, but they didn't even bother to put this gentleman on their trial list and call him as a witness themselves, which they could have done. They chose not to, and then they want to get his deposition testimony admitted because they want to make serious allegations against him without confronting him in court. And again, all of these allegations of alleged fraud vastly predate this termination decision in 2011. And the contracting officer who made the termination decision doesn't know anything about this. He came onto the contract in 2010, so he had no knowledge of any of the prior allegations. And so there's certainly no evidence of bad faith in the decision-making itself. He, as the judge found, he followed all of the FAR factors, and then they try, in their briefing, they try and use his analysis of the FAR factors to decide in determining whether to terminate for default. They use it against him by saying, see, they had another supplier already set up, and one of the FAR factors requires the contracting officer to determine whether there's another source for the contract material if the contract were defaulted. So in any event, we think that Judge Page bent over backwards to be as inclusive as possible and that her findings are supported by substantial evidence and asked it to court. Okay. Thank you, counsel. All right. We'll hear the rebuttal. Yes, Your Honor. Thank you. The critical thing is that it's not whether or not the TDP is producible. It's whether or not it's a promise when you enter into one of these contracts that the TDP is producible en masse. At appendix 1004 is a letter from Martin Electronics that was admitted into evidence where Martin says they manufacture approximately 30% of the units required by the contract with only 4% accepted for delivery. I don't know how else you'd prove that Martin could not manufacture these any better than PSI, and that shows the problem with the TDP. The reality is when you look at the board's decision, the board ignores substantial evidence. For instance, it says that PSI offers no evidence. Mr. Cooper, on the Martin question, did you offer some evidence that the adjudicator rejected, I mean refused to admit or something like that? I think we did, Your Honor, and I believe that there were, when you go through the examination of Mr. Bowen and also the contracting officer, Mr. Pierce, there were pieces of evidence with Martin Electronics that were excluded on relevance grounds in part. The government continually objected that what Martin was able to do was irrelevant, that the government's bad faith was irrelevant. Now the government acknowledges that they should have gone through this McDonnell-Douglas analysis with four factors, the first of which is bad faith. You know, all of their objections at trial, it doesn't matter how lenient Judge Page was, the reality is all of the government's relevance objections at trial are improper when you look at the standard that they now say the board should have considered. Why isn't it fair to say that the only thing that matters is what the adjudicator did, not what the government did? And unless you can point to the exclusion of evidence that relied on an incorrect standard, I'm not sure how you gain traction. That's a fair point. And so I focus on the government's objections because they made so many of them, which of course had an impact on a pro se litigant. There's 60 pages of nothing but objections to this bad faith evidence raised by the government and confusing the tribunal in Appendix 188 through 251. But I think the reality is the exclusion of Mr. King's testimony, who was, by the way, Mr. King was in fact the inspector on this contract early in the contract in 2006, in the first interfaces, so he would have had knowledge about those and he would have had an impact on this contract. Why didn't you call Mr. King? My understanding, Your Honor, is Mr. King was in Kuwait at the time. He had been sent there on another matter for the government. He was unavailable to testify. I don't think that's in the record, but he was also on the government's witness list. So there's a lot to be made of, well, PFI did not identify him on their witness list, but he was on the government's list, and so PFI could have called him if he had been in the country. He was unavailable. I think that the board applied the wrong standard here and excluded evidence that should have come in. I think that had PFI been allowed to introduce Mr. King's deposition, show more evidence with bad faith, and explain why this product was not manufacturable by Martin, then I think that the substantial evidence clearly would have weighed in PFI's favor. And I think the evidence already does, actually. For instance, the board says in its ruling that PFI offered no evidence of correct crimping. Yet there's substantial testimony about that and numerous documents as to that, and there's no explanation offered by the board in its decision as to why that evidence is not even considered. The board never even mentions the evidence. It's as if they missed a day of the testimony, which I know they did not. I don't say that flippantly, but there's large chunks of evidence that the board does not review in its decision that substantiate PFI's claims. So we think the board's decision should be reversed, and either a new trial should be permitted where this evidence can come in, or that this court should convert the termination for default to one of conversion. Thank you all for your time this morning. Thank you, counsel. The case will be submitted.